UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
 SHONTEL NICHOLAS and
 JACQUELINE PACK,

                    Plaintiffs,

                                                      07 CV 134 (SJ) (VVP)

            -against-                        **MEMORANDUM &
                                             ORDER**



THE CITY OF NEW YORK, <u>et al.</u>,

                         Defendants.
--------------------------------------------------------X
A P P E A R A N C E S

EGAN LAW FIRM
258 Broadway, Suite 8E
New York, NY 10007
By:     Susan S. Egan
Attorneys for Plaintiffs

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
By:     Daniel Chiu
        Lisa Marie Griffith
Attorneys for Defendants


JOHNSON, Senior District Judge:

        Plaintiffs Shontel Nicholas ("Nicholas") and Jacqueline Pack ("Pack") filed

the instant action alleging discrimination on the basis of gender, hostile work

environment and retaliation pursuant to the Civil Rights Act of 1964, 42 U.S.C.

1

2000e, <u>et seq.</u>, and related state and local law.[1]  (Nicholas and Pack will hereinafter be referred to as "Plaintiffs," when necessary.)  Defendants move for summary judgment.  Based on the submissions of the parties, and for the reasons stated below, Defendants' motion is DENIED.

<u>BACKGOUND</u>

According to the Complaint, Plaintiffs Nicholas and Pack have been employed by the New York City Department of Corrections ("DOC" or the "Department" or the "City" or "Defendants") since 1991 and 1988, respectively. They were initially appointed Corrections Officers ("CO") and in 2003, were both promoted to Captain and assigned to the Anna M. Kross Center ("AMKC"), an adult male facility on Rikers Island.   Though Nicholas was subsequently transferred to the North Infirmary Command on Rikers Island, Pack is still assigned to AMKC.

As Captains, Plaintiffs are charged with the duty of supervising COs in their supervision, care, and custody of prisoners.  They investigate inmate violations of Department rules, oversee count procedures, and conduct tour inspections to ensure COs' and inmate compliance with Department policies and procedures. Captains are responsible for ensuring inmate access to programs, supervising meal distribution to inmates, and getting medical attention for any sick or injured

---

[1] The Complaint also included a claim pursuant to 42 U.S.C. § 1983 which was withdrawn on the record.

inmates. Captains also manage any unexpected incidents such as inmate altercations. Captains, in turn, are supervised by Assistant Deputy Wardens ("ADWs").

The ADW's duties include distributing post assignments for Captains, holding roll call, assigning late slips, determining whether to grant Captains the requested time off, and reviewing incident reports, among other things. Plaintiffs claim that in the course of carrying out these duties, various ADWs would assign female Captains to less desirable posts and more dangerous duties than male Captains; issue more late slips to females than males; and deny time off to females more frequently than to males. They also claim that male ADWs speak to female Captains in a derogatory manner, sometimes screaming. The Court will address each of these in turn.

*Overtime*

Captains are assigned to specific posts and tours on a weekly basis. If a Captain is not assigned to a specific post but is scheduled to work in a given week, then that person is listed as "Miscellaneous" to be assigned when unexpected vacancies occur. When vacancies for a tour arise at the last minute, they should first be filled by the Captains listed as "Miscellaneous" on the weekly schedule, and then in accordance with the overtime "stick list," which identifies the order in which Captains are to be assigned involuntarily to an overtime tour. The stick list

fills vacancies in the following order: (1) Captains on their last day of their four-day tour; (2) Captains on their first day; (3) Captains on their second day; and (4) Captains on their third day.[2] This system is designed to "stick" those about to have two days off or those who just had two days off before those in the middle of their work week.

Plaintiffs assert that vacancies are filled differently according to whether the Captain is male or female. They allege that if both a female and male Captain are on the last day of their four-day tour (and thus first on the stick list), the male ADWs order the female Captain to assume the vacant post. The male ADWs also allegedly permit the last-day male Captains (first on the stick list) to leave and then assign first-day female Captains (second on the stick list) to work the extra tour.

For example, on February 9, 2004, Nicholas was scheduled to work the 11:00pm to 7:00am tour in KC26B, a housing area. ADW Richard Tullo ("Tullo") assigned Nicholas to work the 7:00am to 3:00pm shift as overtime. Nicholas informed Tullo that Captain Edmund Salpietro ("Salpietro") was above Nicholas on the stick list. Tullo replied that Salpietro had already worked an additional tour that week. When Nicholas stated that "an additional tour" was not the same as overtime, Tullo shouted in what Nicholas describes as a demeaning way, "You're going to assume the post because I'm the Dep[.] and I said so and if you don't take it, you are going to be written up!" Nicholas took the post as assigned. The weekly

---

[2] Sometimes Captains volunteer for overtime when there is an unanticipated vacancy, but if none do, the stick list governs.

schedules for the weeks of February 1 through 20 do not reflect that Salpietro was assigned an additional tour. The tour certification sheets[3] reflect that Salpietro was granted a "time due," or vacation day, on February 7, 2004, two days before Tullo "stuck" Nicholas with the additional tour. The City claims that the tour schedules relied upon by Plaintiffs do not actually reflect the assignments given out, and instead only reflect who was scheduled for particular assignments.

On another occasion when Nicholas was working the 11:00 p.m. to 7 a.m. tour, Tullo asked Nicholas what "day" she was on because Captain Hardy, a male, was running late and he needed someone to cover the following tour. Nicholas explained that she was on her third day, which translates to last priority on the stick list for filling the vacancy. Tullo did not ask Nicholas to stay. However, Nicholas observed Tullo watch Captains Walter Fulton and John Tucker, both male, leave at the end of their tour, even though both were on their "first" days and thus first priority on the stick list. At 7:35 a.m., Tullo asked Pack to wait for Hardy. Pack was on her second day.

On October 30, 2004, Nicholas claims she was assigned to fill a post in the Control Room due to a Captain being out sick. Plaintiffs regard the Control Room post as undesirable. At the time, Nicholas was assigned to a different post and Captain Reilly, a male, was designated "Miscellaneous," and thus ought to have been selected instead of Nicholas. Nicholas cites another incident in which she was

---

[3] Tour certification sheets are the written record of every tour and include information such as the captains assigned to each post during a given tour, searches, and all activity during the tour.

re-assigned to the Control Room, but provides no information as to whether she was filling that post in lieu of a male Captain.

Plaintiffs also allege that in instances in which a male Captain is seeking overtime hours but the available post is one that is undesirable, a female Captain will be removed from her post and assigned the undesirable one, with the male taking her place.

*Searches*

Plaintiffs allege that ADW Vincent Caputo ("Caputo") discriminated against her and other female supervisors in the assignment of various types of searches. All searches required the searcher(s) to prepare reports; if contraband is found, additional paperwork is required. When a Captain is assigned to an inmate housing area, he or she must supervise random searches of 30 inmates per day in the assigned area. If a weapon is found, the prisoner receives an infraction and a package of evidence must be prepared for investigation. In addition to random searches, the facility also conducts institutional searches and divisional searches, which require the search of every inmate and cell in a particular housing area or in the entire jail. These searches require the inmates to strip naked and be examined. Additionally, the facility conducts searches on what is known as a "BOSS Chair." A BOSS (an acronym for "body orifice security scanner") chair positions the individual on the chair in such a way that any items hidden in various body cavities

or clothing are detected. The BOSS Chair is positioned in a busy hallway in order to deter inmate movement, and assignment to it is considered by some to be a punishment. Moreover, because of the increased danger from inmate contact, and the additional paperwork requirements, assignments to housing areas are not considered a preferred post. Plaintiffs do not, however, indicate how many searches they performed, nor do they indicate how many searches male Captains perform.

Plaintiffs also point to a January 21, 2004 incident in which they were both ordered away from essential posts to conduct a search when a male Captain was not.

*Post Assignments*

Somewhat tied into the allegation that they were assigned to searches more often than male Captains, Plaintiffs claim they are disproportionately assigned to undesirable posts. In particular, Plaintiffs cite the Control Room, KC4 and KC5 as the least desirable.

KC4 is where inmates are sent for mental observation, while KC5 is the administrative segregation unit. Both units house inmates who are prone to violence, both against themselves and against officers and other Members of the Service ("MOS"). It is not uncommon for inmates in these housing areas to attempt suicide, be covered in bodily waste, or to throw feces at officers. Nicholas cites a

week in 2004 in which Captain Johnson, a female with a steady post at KC4, took vacation. Despite there being both male and female miscellaneous Captains available, only female Captains were assigned to that post in Johnson's absence.

Plaintiff Pack claims that Environmental Health Officer ("EHO"), Security, Movement, Inmate Assignment and Investigation are the preferred posts. Plaintiffs claim that these are the preferred posts because they are safer. Plaintiffs submit that those Captains with experience at the preferred posts are more likely to be granted requests to be permanently placed at these posts, as those Captains would be more qualified based on their past experience. Therefore, Plaintiffs argue, denying female Captains even temporary access to the preferred posts has the effect of denying them the opportunity to ever hold these posts steadily.

The preferability of one post in particular, the Control Room, is in dispute. Plaintiffs claim that this is an undesired post but do not claim that it is unsafe or involves a lot of inmate contact. Instead, they claim that the rigors of this post make it very challenging, and thus undesirable. According to Plaintiffs, the post requires Captains to assign overtime, supervise alarms, secure keys, pepper spray, and radios for the entire facility, fill out various paperwork regarding tour certifications and overtime, to ensure that all subordinates are on their assigned posts, and that sick inmates are transported to hospitals in a timely manner. The City argues that experience in the Control Room would advance Plaintiffs' career opportunities and, for that reason, cannot be considered undesirable.

*Late Slips*

Late slips are issued to Captains who miss roll call. There is no evidence as to exactly how late a Captain must be to be given a late slip, but there is some evidence to suggest that it is to some degree within the assigned ADW's discretion. There are two lateness classifications: one is referred to as "late to roll call" and the other, simply "late." One who is deemed "late to roll call" is not docked any compensatory (i.e., vacation) time while one marked "late" does lose compensatory time. If a Captain is determined to be excessively late, he or she can be issued what is referred to as a Command Discipline ("CD") and face the loss of compensation or vacation time. The City cites Nicholas' Employee Service Report which indicates only one lateness. However, Nicholas' time cards reflect three latenesses and Nicholas argues that one of these instances is unsubstantiated in that she was both marked "late" and "late to roll call," when a given lateness should be classified as one or the other, and not both. Nicholas provided no support for this interpretation of DOC Regulations, but cites ADW Tullo's deposition, in which he testified that late to roll call slips are "rarely ever issued."

Pack received either four or five late slips between 2003 and 2005. She does not dispute that she was late but claims that men infrequently receive late slips. She also argues that she should have instead have been marked late to roll call.

*Women's Locker Room*

Guy Brown ("Brown"), Plaintiffs' delegate to the Corrections Captains Association testified that, for some time, an inadequate trailer functioned as the women's locker room, due to the increased hiring of women and lack of available space at the facility at that time. The locker room was eventually expanded, although, at certain points related to this litigation, had not yet been equipped with a fire door, as the men's locker room was. Moreover, the women's locker room was in a location that made women more susceptible to lateness. Specifically, the women's locker room was located prior to one of two gates that all officers needed to pass to enter the roll call area. The women's locker room was situated between the first and second gate, and it was at the second gate at which ADWs were posted. The men's locker room, on the other hand, was located beyond the second gate. The effect of this floor plan was that if two officers, one male and one female, both arrived in civilian clothing or otherwise both needed use of their locker rooms, the male officer would proceed straight through both gates, and pass the ADW. While that officer may have cleared the ADW's gate on time, he might remain in the men's locker room changing until he is technically late, and might do so with impunity. The woman who arrived at the same time as him, also needing to use the locker room, would have to stop before the second gate, and though potentially dressed and present for roll call before the male officer, would clear the

second gate later and be more likely to be issued a late slip. Additionally, the locker room had inadequate ventilation, with windows that did not open properly, and lacked air conditioning.

*"Time Dues"*

In DOC parlance, a "time due" is a request for time off of work, which can be a number of hours or days and, according to Nicholas, is "basically a paid day off." There are regular time dues and emergency time dues, and Captains who are on the Miscellaneous list but not needed for a particular post are deemed eligible for a time due. While Plaintiffs do not dispute that they were never denied an emergency time due, they claim women were denied regular time dues by ADWs at a rate greater than male Captains, and according to Pack, she was never granted a regular time due.

In support of Nicholas' claim, she cites two incidents. The first occurred on February 7, 2004. On that day, both Nicholas and Pack were denied time dues while two male Captains had their requests granted by ADW Michael Guanari ("Guanari"). Plaintiffs further argue that Guarnari granted the time dues to the male Captains by phone, when DOC regulations require Captains to make the requests in person. In the second incident, Nicholas requested a time due immediately after roll call and was told by ADW Caputo that he would "see what

he can do." Nicholas thereafter learned that the time due was awarded to a male Captain who requested the time due after she did.

*Other Incidents of Discrimination*

Plaintiffs allege that male ADWs often speak to them in a derogatory manner, addressing women Captains as "you" or "yous people" rather than by name. They also claim that male Captains yell at them over the radio and in front of their subordinates, undermining Plaintiffs' authority as Captains. On February 2, 2004, Plaintiffs recall an incident during which ADW Caputo snubbed them by failing to return their salutes, only to return the salutes of two male COs. As COs are ranked below Captains, Plaintiffs claim that Caputo's behavior further undermined their authority. In support, Plaintiffs point to the Department's Rule 3.20.100 requiring members in uniform to "render and return the personal salute prescribed by the United States Army Drill Regulations." Rule 3.20.100 further provides that "[t]he salute shall be rendered by the subordinate and acknowledged by the supervisor." Pack further alleges that on July 24, 2004, ADW Guanari accused her of refusing to obey one of his orders, which he described as a "simple fucking job." Finally, Pack claims that on an unspecified date, ADW Caputo told her, "Women don't belong in Corrections."

*Use of Force Reports*

In December 2003, Nicholas was assigned to investigate two instances of use-of-force. DOC regulations require that the investigation, referred to as "packages," be completed in four days. Plaintiffs claim that, on account of the size of the jail and the individual Captain's workload, extensions of time are routinely granted "so long as the assigning ADW is kept apprised of the Captain's progress." Nicholas claims that she did keep ADW Jesse Vann ("Vann") abreast of her progress but that he issued two CDs against her anyway, resulting in a verbal reprimand and the loss of one vacation day. Both Plaintiffs claim that the issuance of a CD in this circumstance is rare. The City claims it was instead a female ADW, Brenda Ross ("Ross") who wrote Plaintiff up.

*Plaintiffs' Verbal Complaints*

Plaintiffs allege that they began to complain of discriminatory treatment as early as June 2003, when Nicholas "brought the verbally disrespectful behavior of the male supervisors to the attention of Warden [Valerie] Oliver." Both Nicholas and Pack also complained to Brown. Brown testified that he was aware of ADWs speaking condescendingly to subordinates and stated that "men didn't tolerate it." Brown testified that he received complaints from "mostly" female Captains and that he spoke to several ADWs about their tone, including Caputo, Guanari, Vann, Kenneth Limbach and Tullo. Brown testified that Tullo "had a big one," by which

Brown meant to refer to a sit-down counseling by the Department. The record does not indicate that any admonishment specifically mentioned gender. Plaintiffs also claim that Brown's effort to vindicate their grievances was met with retaliation, as he was issued 10 CDs in the two-year period after he begun taking action on Plaintiffs' complaints.[4]

*Plaintiffs' Written Complaints*

On June 11, 2004, Pack submitted a letter to Warden Oliver complaining about what she deemed to be disparaging comments made by Tullo. While the Court's copy of the letter is not entirely legible, it states, in part, that Tullo, in a "loud" tone, told Pack, "You people are always late. Be sure to put it on paper." It does not appear that Pack mentioned either the word "discrimination" or any gender-based conduct.

On July 12, 2004, Nicholas submitted a complaint to Warden Oliver entitled "Grievance on Discrimination and disparaging treatment" ("the July 12 Complaint"). In it, she describes the events of July 11, 2004, specifically that her tour of duty was changed to the Control Room when policy instead required that someone else (in this case, a male Captain) be assigned that post. Nicholas alleged in the July 12 Complaint that she was told that ADW Tullo threatened to suspend her if she refused the Control Room post. Plaintiff wrote, "the determination on

---

[4] Brown testified that eight of the 10 CDs brought against him were dismissed.

[*sic*] who fills a vacant post should only be carried out by following the written Guidelines set by the N.Y.C. Dept. of Corrections not by race or gender."

A week later, Nicholas filed what she labeled as an "addendum" to her complaint. In it, she asks that a Command Discipline be initiated against Tullo for threatening to suspend her, and for his "history of ridiculing, insulting, embarrassing and showing other types of disrespect toward his subordinates," with which Nicholas assumes Warden Oliver to be familiar, based on "prior corrective measures" taken against Tullo in the past, which, according to Nicholas "seem[s] not to have been taken that seriously by ADW Tullo." She also complained that Tullo failed to follow protocol by having a CO direct her to her new post rather than a supervisor.

*Alleged Retaliation*

Pack claims that she was written up "violat[ing] rules which [she] did not violat[e]." In the period between June 2004 and August 2007, Pack had disciplinary charges filed against her nine times.

On June 9, 2004, Pack was written up for disobeying the orders of ADW Caputo. According to Pack, two days earlier she was assigned a post by Warden Edward Duffy ("Duffy") and thereafter was reassigned by Caputo to an institutional search in violation of DOC procedure. Specifically, Pack alleges that a Captain at a non-essential post should have been selected but was not. Pack claims

that she inquired of Caputo why Maysonet, a male Captain then-filling a non-essential post, was not selected.  According to Pack, Caputo then threatened her with disciplinary sanctions.  Pack did not inform Caputo that his order conflicted with the one issued by the Warden, Caputo's superior, but instead sought out Brown.  Together, Pack and Brown spoke to Duffy, who, according to Pack, "reiterated the importance" of his assignment over Caputo's.  As a result, Pack did not report to the institutional search.  Caputo later contacted Pack over the radio to inquire why Pack disobeyed his orders.  Pack claims that he addressed her in "his customary abusive and condescending tone" and then issued a CD against her for failing to obey orders.  At a departmental trial, Administrative Law Judge ("ALJ") Karen Miller noted that Caputo's testimony was inconsistent and unpersuasive, compared to Pack's testimony, which ALJ Miller found to be "straightforward and unambiguous."  ALJ Miller ultimately determined that the Department failed to substantiate the charge of misconduct.

In the same departmental trial, ALJ Miller reviewed another Command Discipline entered against Pack.  This charge stemmed from a July 24, 2004 incident in which the department conducted a mock disaster drill in the building sector assigned to Pack.  Pack evacuated her inmates to the intake area and then learned of an injured inmate in another section of the facility.  Because she had been ordered by ADW Guanari to have her inmates remain in the intake area, she instructed the COs under her supervision to keep them there, and then personally

headed for the site of the injured inmate, where she began an investigation of the assault. The officers left with her inmates received an order from a Control Room Captain instructing them to return the inmates to their sector. This order conflicted with the Guanari's order to Pack. Pack alleges that Guanari, believing she disobeyed him, screamed at her. Pack alleges that Guanari asked "[W]hy are fucking inmates back in 9 module when I told you to make sure they didn't go back? [. . .] A simple fucking job." Pack thereafter filed a report complaining of Guanari's "disrespect and degradation."

Approximately two weeks later, Guanari filed a Command Discipline against Pack for her actions on July 24, 2004, specifically her alleged failure to supervise the work of all Correction Officers during the mock disaster drill. The ALJ again determined that the department failed to establish misconduct, and intimated that Guarnari filed the CD in retaliation for Pack's complaint of his conduct.

On November 3, 2004, Pack reported for roll call, during which ADW Sammie McCovey ("McCovey") allegedly said, in front of at least eight Captains and 80 officers, "Pack, move down to the other side. I'm a [*sic*] watch your butt as you walk." Pack claims that McCovey's comment caused her to feel humiliated, and she left roll call for the locker room. According to Pack, McCovey called her over the radio and reported her back to the roll call area, where she was ordered to write a report explaining why she disrespected him by leaving. Although Pack did

not agree that she disrespected McCovey, she wrote the report he asked her to write but described the incident as she experienced it (the "Roll Call Incident"). Pack, who claims to have been a victim of domestic abuse of both the physical and emotional types (and who at the time had an order of protection preventing the father of her child to come to her home) remained distraught and upset about the incident and felt shame and embarrassment when she faced the other officers who had been present. She was referred by Brown to an employee clinic, was relieved from duty due to emotional stress, and went home. Within two hours, ADW Colon arrived at Pack's home to retrieve her firearm. Colon did not provide Pack with an explanation.

The following day, Pack was cleared for duty and met with Warden Valerie Oliver, who Pack claims to have sided with McCovey and warned Pack to "dot [her] I's and cross [her] T's." Pack took this to mean that her work would be scrutinized in retaliation for complaining about McCovey.

As to Plaintiff Nicholas, she claims that, in addition to being issued a Command Discipline following her failure to submit the results of her use-of-force investigations on time, ADW Caputo retaliated against her in November 2004 by closely scrutinizing her conduct, specifically by copying any logbooks into which Nicholas made entries, questioning her decisions and suggesting she played a role in the disappearance of contraband currency found on an inmate.

On November 4, 2004, Pack filed a written complaint with the Department alleging sexual harassment. The Department did not interview her in connection with this complaint. Four days later, she filed a complaint with the EEOC, claiming discrimination on the basis of sex, and retaliation. Two months later, in January 2005, McCovey issued a CD against Pack for failure to obey orders, acting disrespectfully toward a supervisor, failure to conduct roll call, and conduct unbecoming of an officer, all arising out of the Roll Call Incident. McCovey denied ever making sexually suggestive comments to Pack.

A departmental trial was held on October 5, 2006 and November 2, 2006, at which ALJ Donna Merris determined that McCovey's version of events could not be credited. In particular, McCovey claimed that he merely ordered Pack to line up, as she was late to roll call. However, the ALJ noted that three witnesses, including the Captain who led roll call, testified that Pack was already in formation. Additionally, one officer testified that he heard the word "butt" and soon after heard McCovey say "She's got a nice ass." Two individuals testified that the comments were discussed "throughout the facility for the next several days." Moreover, the testimony of ADWs Colon and David Washington ("Washington"), who were present when Pack returned to roll call, contradicted McCovey's -- Colon testified that McCovey ordered him present, while McCovey claimed he did not know why the other ADWs were there. Additionally, McCovey claimed Pack never requested the presence of her union delegate, while Washington testified that

she did. For these among other reasons, the ALJ determined that the charges against Pack arising from this incident were unsubstantiated.

A third departmental trial was held in 2008, stemming from a host of charges brought against Pack during 2005. ALJ John Spooner reviewed seven specifications and determined that Pack failed to ensure that an inmate's attorney visit commenced in a timely manner and was insubordinate on two occasions during which she screamed at a female ADW. Of the seven specifications arising from these incidents, five were deemed proven by the ALJ and Pack was suspended for a period of 40 days. While Pack alleges that work became "increasingly intolerable" during this time, she does not specifically allege that any of these set of CDs were motivated by discrimination or retaliation.

Finally, Pack argues that she requested a transfer out of AMKC every six months beginning in January 2006 but was denied in retaliation for her complaints. The City alleges that Pack withdrew her initial request. Pack's November 1, 2006 request was denied based on her service record.

On November 19, 2004, Nicholas filed a charge with the New York State Division of Human Rights (the "NYSDHR Charge") alleging discrimination on the basis of gender, and retaliation.

Soon after, on November 21, 2004, Nicholas fell ill at work and was taken to the hospital, where she reported dizziness and chest pains and physicians noted cardiac dysrhythmia and hypertension. She was placed on sick leave for a period

of 45 days.   Consistent with DOC regulations, Nicholas reported to the City's Health Management Division to be seen by Dr. Mathur, a Department physician, who referred her to Dr. Faouzio Barouche ("Barouche"), a psychologist.  Nicholas admits that at the time, she was suffering from stress, anxiety, headaches, stomach pains, diarrhea, nausea and insomnia, but did not think that she exhibited symptoms that warranted the referral to Barouche.  Nicholas claims that she discussed neither her feeling of being discriminated against nor her fear of retaliation, but only concerns about her physical condition. Nevertheless, on the basis of Barouche's analysis of Nicholas' anxiety level, Nicholas was deemed psychologically unfit for duty and forced to surrender her weapon and official identification.  On December 11, 2004, Nicholas sought the opinion of a psychiatrist, and that psychiatrist contradicted Barouche's findings.  However, the Department did not modify her classification until July 2005, and her weapon was not returned until November 2005.   Nicholas claims that these designations were retaliatory, and that they caused her to be ineligible for certain posts and transfers.  Moreover, Nicholas complains that being forced to surrender her firearm put her in danger while off-duty, as it is not uncommon for officers to come across former inmates who may have a vendetta against the particular officer or the criminal justice system in general.

While Nicholas was fighting to undo these classifications, she was administratively transferred to North Infirmary Command, where she was then

misclassified as "Chronic Sick."  With a "Chronic Sick" classification, Nicholas was ineligible for the transfers she requested.

On May 5, 2005, Nicholas filed a 60-page charge of discrimination and retaliation with the EEOC, which issued a Right-To-Sue letter on September 13, 2006.  By then Pack, too, had received a Right-to-Sue letter.  This lawsuit followed.

Presently before the Court is Defendants' motion for summary judgment.  It argues (1) there is no individual liability under Title VII; (2) Plaintiffs have not suffered an adverse employment action; (3) the circumstances do not give rise to an inference of discrimination; (4) Defendants' actions were motivated by legitimate non-discriminatory, non-retaliatory reasons; and (5) Plaintiffs fail to allege wrongdoing sufficiently pervasive or offensive to constitute a hostile work environment.

## DISCUSSION

*Summary Judgment Standard*

It is well-settled that a party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).  Material facts are those that may affect the outcome of the case.  See Anderson, 477 U.S. at 248.  An issue of fact is considered

"genuine" when a reasonable finder of fact could render a verdict in favor of the non-moving party.  Id.

In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 248).  If the Court recognizes any material issues of fact, summary judgment is improper, and the motion must be denied.  See Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985).

If the moving party discharges its burden of proof under Rule 56(c), the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading."  Anderson, 477 U.S. at 256.  Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment.  Id. at 247-48.  Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor.  Id. at 248; see also Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1999) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.").

*Individual Liability*

The Complaint names numerous DOC employees individually, a Commissioner, Chief, three Wardens, several ADWs and a City physician. However, individual supervisors are not liable under Title VII. See Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003). Therefore, Plaintiffs' Title VII claims against these individuals are dismissed.

The same cannot be said about the claims against the individual defendants arising under the NYSHRL or NYCHRL, as those statutes permit claims against "employers (1) with an ownership interest or the power to make personnel decisions [. . . ] or (2) individuals who aid or abet the harassment." Ruggerio v. Dynamic Elec. Sys., Inc., 2012 WL 3043102, at *5 (E.D.N.Y. Jul. 25, 2012) (citing Patrowich v. Chemical Bank, 63 N.Y.2d 541, 542 (N.Y. 1984)). Therefore, the individual defendants could be held liable.

*McDonnell Douglas Burden-Shifting Analysis*

Discrimination claims brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., have long been guided by the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973). Under this test, Plaintiff must first make a *prima facie* case of discrimination.

In order to establish a *prima facie* case of discrimination based on gender under Title VII, an employee must show that he or she: "(1) is a member of a protected class; (2) was qualified for the position at issue; (3) suffered an adverse employment action; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination." See Mandell, 316 F.3d at 377 (applying the framework set forth in McDonnell Douglas). Assuming the plaintiff demonstrates a *prima facie* case, "the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason" for the adverse action. Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996). "[I]f the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination." See id. Finally, in order to survive a motion for summary judgment, plaintiffs must offer "concrete particulars" to substantiate the claim. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985). [5]

---

[5] For years, it was common practice in this Circuit to apply the same analysis to federal, state and local employment discrimination claims. See, e.g., Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006). However, this changed in Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277 (2d Cir. 2009). There, the Second Circuit recognized that New York City's Local Civil Rights Act of 2005 (the "Act") abolished "parallelism" between NYCHRL and either federal or state laws and the Act required an independent and liberal analysis of those claims, separate from federal and state counterparts. Id. The Act served to communicate the legislature's intent to treat federal and state human rights law as a floor, leaving open the possibility that a NYCHRL claim could prevail where

Here, Defendants argue that Plaintiffs have established neither the third or fourth prong of their respective prima facie cases in that they have not suffered an adverse employment action and cannot demonstrate that any complained-of action arose under circumstances that permit an inference of discrimination.

*Adverse Employment Actions*

An adverse employment action is a "materially adverse change" in the conditions of employment.  <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000).  To be "materially adverse" the change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" and can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  <u>Id.</u> (citations omitted).

Here, the record is murky.  Plaintiffs claim that they were assigned to more searches than male Captains and received those assignments as punishment.  They also claim they were assigned to undesirable posts, denied time dues, yelled at and spoken to in a derogatory fashion by ADWs.  Nicholas additionally claims that she was closely scrutinized and marked late.  Pack claims she was repeatedly denied a

---

a NYSHRL or Title VII claim based on the same facts failed.  Whether this distinction is of import is a matter to be addressed at trial.

transfer for discriminatory reasons and that McCovey discriminated against her on the basis of her sex during the Roll Call Incident.

However, Plaintiffs describe various DOC policies without reference to official documentation, such as the policy dictating which Captains are involuntarily "stuck" for overtime; the policy by which vacant posts are to be filled; the significance of "essential" versus "non-essential" posts; and the procedure for requesting a "time due." At the same time, Defendants do not refute any of the descriptions offered by Plaintiffs.

In arguing that these policies are sometimes skirted in order to assign men to the more favorable posts, Plaintiffs submitted DOC schedules and tour certifications, which they submit collectively demonstrate that posts were assigned in a discriminatory fashion. Again, Defendants do not counter this evidence. Indeed, of all the posts deemed undesirable by Plaintiffs, the City only contests one, the Control Room. In any event, the City argues that none of the post assignments constitute adverse employment actions because they are each included in a Capatin's job description. Additionally, the City argues that Plaintiffs' allegations are inadequately supported by the record.

The City is correct, in part. Plaintiffs' claim that they were ordered to conduct searches more often than male Captains is supported largely by conclusory or irrelevant testimony. For example, the only specific instance mentioned by Nicholas involves her assignment to cover a search on January 21, 2004. Nicholas

claims that on that day she was assigned to an essential post and should not have been ordered to attend the search. However, this is not an adverse action as to Nicholas because she later indicates that someone else (incidentally, Plaintiff Pack) was ultimately assigned to the post in her stead.

Pack, in turn, alleges that on same that day she was initially assigned as the Security Captain (an essential post) and also should not have been re-assigned to the search. She further claims (without aid of support) that when James Bowden, a male Captain, is assigned as Security Captain, he does not perform certain types of searches. Finally, Pack alleges that on June 7, 2004, she was again removed by Caputo from an essential post and ordered to report to an institutional search while Captain Maysonet, a male in a non-essential post, was overlooked. Pack was then written up by Caputo and in the ensuing investigation, Maysonet claimed he had never been assigned to institutional searches.

The only other evidence of discrimination in the assignment of searches was the deposition testimony of Brown, who claimed that the assignment to conduct searches on the BOSS chair was used as a punishment. However, Plaintiffs have not offered evidence of the number of men or women assigned to the BOSS chair during the period in question.

Therefore, Plaintiffs have not established that that female Captains were assigned to searches at a disproportionate rate.

However, with respect to post assignments and overtime, genuine issues of material fact remain. As stated earlier, Plaintiffs cite various posts as desirable or undesirable and the only classification Defendants challenged was the Control Room. Additionally, Plaintiffs claim that without experience in those posts, they would remain unqualified to ever apply for them on a steady basis, which Defendants do not dispute. Therefore, Defendants have not met their burden under Rule 56 and Plaintiffs' claim of discrimination in the assignment to posts and overtime must survive this motion. See Parrilla v. City of New York, 2011 WL 611849, at *8 (S.D.N.Y. Feb. 16, 2011) ("Safe working conditions are an objective indicator of desirability.") (quoting Guzman v. City of New York, 2010 WL 4174622, *19 (E.D.N.Y. Sept. 30, 2010) (denying summary judgment of plaintiff's claim of gender discrimination where DOC "did not present any evidence relating to assignment by gender to 'preferred' posts").).

Next, Plaintiffs claim discrimination in Defendants' issuance of late slips. Specifically, Nicholas claims that she was given three late slips between October 16, 2003 and March 22, 2004 and one late to roll call slip, also on March 22, 2004. Pack claims that she received either four or five late slips between 2003 and 2005. Neither Plaintiff denies being late on any of these occasions, although they argue that the location of the women's locker room contributes to more women being marked late than men who arrive to work at the same time. Brown's testimony about the women's locker room is consistent with Plaintiffs'. Also, Plaintiffs argue

that being marked late results in a loss of compensatory time and could also result in a CD if latenesses are deemed "excessive." This conclusory evidence, alone, is insufficient to establish discrimination.

The City does not dispute that both Plaintiffs had their firearms confiscated after the suggestion was made that each were psychologically unfit. Moreover, as to Nicholas, the City also does not dispute that Nicholas was incorrectly placed on the Chronic Sick list, preventing her from being transferred. These events may also be considered by a jury.

On the issue of time dues, both Plaintiffs claim they were denied these requests in a discriminatory fashion. Pack points to one incident in 2004 and Nicholas points to two in which they each requested a time due in person but were denied them by male ADWs. Plaintiffs claim that in both instances a male ADW granted the time dues to male Captains and did so over the phone, when DOC policy requires that time dues be requested in person, as Plaintiffs had done. Again, this evidence is insufficient on its own to withstand summary judgment.

However, it is not inconceivable that a jury may find that the sum of the actions complained of by Plaintiffs collectively constitute an adverse employment action. See, e.g., Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) ("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'").

*Inference of Discrimination*

Where Plaintiffs' argument falls short, however, is in demonstrating -- as they must for Title VII purposes -- that male Captains who were similarly situated to them in all material respects received more favorable treatment. There is some undisputed evidence in the record to indicate that some of the actions complained of are gender-based, such as, underlined inter alia, the testimony about the location of the women's locker room, and Brown's testimony that male Captains "didn't put up with" mistreatment by ADWs, Plaintiffs patently fail to compare themselves to male Captains "in all material respects." Therefore, their Title VII discrimination claim fails.

However, taking into consideration the more lenient standard now afforded discrimination claims brought under the NYCHRL, the Court declines to dismiss those claims. See Bumpus v. New York City Transit Auth., 2008 WL 399147, at *3 (N.Y. Sup. Ct. Feb. 13, 2008) ("The legislative history contemplates that the Law be independently construed with the aim of making it the most progressive in the nation."). The City does not address this distinction, and, given that Plaintiffs' other claims survive summary judgment, the Court thinks it more prudent to have the City revisit this issue and renew its application at trial, if it so chooses.

*Hostile Work Environment*

The cause of action for hostile work environment, while also a creature of Title VII, does not follow the McDonnell Douglas burden-shifting test. Instead, a Plaintiff alleging a hostile work environment must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986)); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000). The employee need not be fired, demoted, or necessarily suffer an economic or professional set-back. What is required is a material -- and negative -- change in conditions, and the complained-of conduct must relate to a protected characteristic, such as race, gender, religion, or national origin. See Harris, 510 U.S. at 21; Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). There is both a subjective and objective aspect to this test. The alleged misconduct must be objectively offensive and the employee must perceive the environment to be abusive. Id. Finally, there must be a "specific basis for imputing the conduct that created the hostile work environment to the employer." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). "[A]n employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Id. (citations omitted).

A "mere utterance of an . . . epithet which engenders offensive feelings in an employee" is insufficient.  <u>Meritor</u>, 477 U.S. at 67.  Additionally, the incidents complained of "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  <u>Alfano</u>, 294 F.3d at 374.

It has been held that some singular acts, by their shocking nature and effect on the employee, can defeat dismissal of a claim.  <u>See</u>, <u>e.g.</u>, <u>Howley v. Town of Stratford</u>, 217 F.3d 141 (2d Cir. 2000) (barrage of insults in singular tirade to female fire department lieutenant referring to her as a "fucking whining cunt," refusing to apologize "to the fucking cunt down there" and suggesting she was not appointed to a higher position because she did not "suck cock good enough and only made lieutenant" deemed sufficient to withstand summary judgment).  Therefore, one particularly egregious incident needn't be accompanied by less offensive ones to succeed.  Nor do frequent though less blatant events need to be bolstered by an extreme one.  Rather, courts must balance both the quantity and quality of the abuses alleged in order to determine whether a jury could find that the workplace as a whole was thereby made intolerable. <u>See</u> <u>Cruz</u>, 202 F.3d at 570 ("[P]laintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.") (citations omitted); <u>Richardson v. New York State Dep't of Correctional Servs.</u>, 180 F.3d 426, 439 (2d Cir. 1999) ("There is neither a threshold 'magic number' of harassing incidents that

gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.").

In this case, the Court finds that Plaintiffs have sufficiently set forth a claim for hostile work environment. For the same reasons that the Court finds that the totality of work conditions could cumulatively constitute an adverse employment action, those same circumstances could both quantitatively and qualitatively support a finding of an objectively hostile work environment. Both women have also set forth evidence that they subjectively perceived the environment to be hostile: Plaintiff Pack alleges that she suffered somewhat of an emotional breakdown after the Roll Call Incident. Nicholas, on the other hand, manifested symptoms of physical distress.

"The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in plaintiff's position, considering all the circumstances, including the social context in which particular behavior occurs and is experienced by its target." <u>Redd v. New York State Div. of Parole</u>, 678 F.3d 166, 176 (2d Cir. 2012). Again, given the particular circumstances of law enforcement work, and prison work in particular, a reasonable juror could find Plaintiffs suffered a hostile work environment on account of gender by being shamed, repeatedly disciplined, addressed condescendingly, stripped of a firearm, or deemed mentally unstable (which both Plaintiffs claim) and/or being objectified (which Plaintiff Pack claims). Pack has also alleged

sufficient facts to support a separate finding that she suffered sexual harassment and not just a hostile work environment based on gender.  Cf. Howley, 217 F.3d 154 ("In an occupation whose success in preserving life and property often depends on . . . unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect . . . of diminishing the respect accorded the officer by subordinates."); see also Williams v. City of New York, 2012 WL 2524726, at *6 fn.6 (S.D.N.Y.  Jun. 26, 2012) ("[I]n certain hazardous lines of employment, employees have a special need to rely on each other.") (citing Howley).  Therefore, these claims survive summary judgment.

*Retaliation*

The McDonnell Douglas burden-shifting test applies to Plaintiff's claim of retaliation.  To put forth a *prima facie* case of retaliation, Plaintiff must show: (1) that she engaged in an activity protected by Title VII; (2) that her employer was aware of that activity; (3) that she suffered an adverse employment action; and (4) that there exists a causal connection between the protected activity and the adverse action.  See Sista v. CDC Ixis North Amer., Inc., 445 F.3d 161, 177 (2d Cir. 2006).  Again, if the employer proffers a legitimate non-retaliatory reason for the adverse action, Plaintiff must carry the ultimate burden of demonstrating that the proffered reason is a pretext for retaliation.

In order to engage in a protected activity, Plaintiffs must oppose some practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). "Specific reference to Title VII is not required but 'the employer had to have been aware of the complaint and must have understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.'" Marrero v. R-Way Moving 7& Storage, Ltd., 2012 WL 3544752, at *9 (E.D.N.Y. Aug. 16, 2012) (citation omitted).

Here, Plaintiffs claim that they engaged in protected activities as early as 2003. However, the record reflects that any verbal complaints made by Plaintiffs were of a general nature. The record does indicate that on July 12, 2004, Nicholas submitted a letter to Warden Oliver stating that ADW violated various DOC guidelines in the assignment of posts and treatment of Captains. Nicholas letter states, inter alia, that "[i]n making the determination on [sic] who fills a vacant post should only [sic] be carried out by following the written guidelines set by the N.Y.C. Dept. of Correction not by race or gender." Nicholas' submission of this letter is a protected activity. Nicholas further engaged in a protected activity by filing a charge of discrimination with the New York State Division of Human Rights on November 19, 2004.

Pack also engaged in a protected activity. On November 3, 2004, the day of the Roll Call Incident, she submitted an incident report in writing to Warden Oliver. She wrote as the subject of her letter: "Sexual Harassment by ADW

Sammie McCovey."   Additionally, Pack filed a charge of discrimination with the EEOC on November 8, 2004.

Therefore, Nicholas and Pack engaged in protected activities known to their employer no later than July 12, 2004 and November 3, 2004, respectively.

Next, the Court has examined the parties' submissions to determine whether either Plaintiff suffered an adverse employment action.   Naturally, the Court's consideration is limited to those actions following the dates of Plaintiffs' respective complaints of discrimination, rather than the timely actions considerable under the gender discrimination and hostile work environment theories of recovery. Additionally, the adverse action must be material, and not just of trifling significance to Plaintiffs' employment.   In that vein, Nicholas appears to state four potentially adverse employment actions that occurred following her complaints of discrimination – (1) increased scrutiny of her work; (2) the determination, by HMD, that she was psychologically unfit for duty; (3) the concomitant confiscation of her firearm; and (4) her subsequent unjustified placement on the Chronic Sick list.   Pack complains that she was written up by McCovey less than three months after her complaint about the Roll Call Incident.

Like the adverse employment actions alleged by Plaintiffs in support of their claims of gender discrimination, it cannot at this stage be said that these actions cannot constitute a material change in the conditions of employment, as a reasonable jury could find that they are of a type that would "dissuade[] a

reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co., 548 U.S. at 53, 68 (2006). Therefore, Plaintiffs have met their burden on this prong.

Finally, to make out a prima facie case of retaliation, Plaintiffs must demonstrate the existence of a causal connection between the protected activity and the adverse employment action. "Such a causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse employment action." Bucalo v. Shelter Island Union Free School Dist., 691 F.3d 119, 131 (2d Cir. 2012); see also Feingold v. State of New York, 366 F.3d 138, 156-7 (2d Cir. 2004) (collecting cases). Here, the adverse actions about which Nicholas complains began occurring on November 16, 2004, when ADW Caputo began what Nicholas believed to be intense and unwarranted scrutiny of her work, including photocopying the pages of her logbooks and interviewing inmates whose conduct she was investigating. Nicholas claims that the retaliation continued when Warden Oliver referred her to the Department's psychologist who, on December 9, 2004, deemed Nicholas unfit to carry a weapon. Consequently, Nicholas was required to surrender her firearm and have her employee identification card modified to reflect her change in status. She remained without a firearm until

November 2005.  These actions are close enough in time to Nicholas' July 12, 2004 complaint of discrimination to make a prima facie showing at this juncture.[6]

In terms of temporal proximity, Plaintiff Pack's claim is even stronger. She submitted a written complaint to the Department on November 3, 2004, the day of the Roll Call Incident.   She claims that the following day Warden Oliver told her to "dot all [her] I's and cross [her] T's" because Pack should expect increased scrutiny of her work.  Pack filed her charge of discrimination on November 8, 2004.  On January 5, 2005, ADW McCovey filed a Command Discipline against Pack, claiming that during the Roll Call Incident Pack spoke to him in a disrespectful manner, engaged in conduct unbecoming of an officer and failed to properly conduct roll call.

Both Plaintiffs have met their prima facie burden of proving retaliation.

The burden now shifts to Defendants to identify a legitimate non-retaliatory reason for the adverse actions temporally connected to each Plaintiff's complaint of discrimination.  Here, Defendants do not respond to the allegations that Plaintiffs'

---

[6] Nicholas' claim that she was improperly kept on the "Chronic Sick" list, while supported by the record, is made without the details necessary to determine whether it was done under circumstances permitting the inference of retaliation.   Specifically, Nicholas submitted a February 27, 2008 Department-issued letter acknowledging that a November 28, 2006 categorization of "Chronic Sick" was incorrect, and that Nicholas had not been categorized as "Chronic Sick" since "calendar year 2005."  Without knowing when in 2005 she was deemed chronically sick, the Court cannot link the event temporally to a protected activity.  Plaintiff has not done so, but Defendants, too, have failed to address this issue.  Accordingly, it was not considered in this step of the analysis.

work came under greater scrutiny following their respective complaints of discrimination. As to the other claims, Defendants posit various reasons. Nicholas, the City argues, was referred to a psychologist because she reported "anxiousness, heart palpitation, back pain, lightheadedness, dizziness, shortness of breath, chest pains, and sleep deprivation." The City also argues that Dr. Barouche had cause to determine that Nicholas was psychologically unstable and that, in light of that diagnosis, it was incumbent upon the Department to both change Nicholas' employee status and confiscate her firearm. Defendants claim that Plaintiff Pack was written up because she did in fact engage in conduct unbecoming of an officer and failed to properly conduct roll call, as McCovey described the roll call incident.

"[T]he determination that a defendant has met its burden of production . . . can involve no credibility assessment. For the burden-of-production determination necessary *precedes* the credibility-assessment stage." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). Thus, a defendant carries its burden by proffering evidence which "*taken as true* would *permit* the conclusion that there w[ere] non[retaliatory] reason for the adverse action." Id. (emphasis in original). This is a "relatively light burden of production." Bagley v. J.P. Morgan Chase & Co., 2012 WL 2866266, at *10 (S.D.N.Y. Jul. 12, 2012) (citation omitted). Accordingly, the Court finds Defendants' proffered reasons sufficient at this stage.

Once a defendant has met this burden, "the McDonnell Douglas framework – with its presumptions and burdens – is no longer relevant." St. Mary's, 509 U.S.

at 510.  Instead, "[a]t the third stage of the <u>McDonnell Douglas</u> test, 'the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that the prohibited retaliation occurred." <u>Bagley</u>, 2012 WL 2866266, at *11.  Plaintiffs must come forth with evidence sufficient to support the following two conclusions: that Defendants' reasons for the adverse actions complained of are false and that those actions were motivated by retaliatory animus.  In other words, it is not sufficient to simply proffer evidence that would support the conclusion that the employer should be disbelieved.  If that were enough, a plaintiff's mistreatment at work ungrounded in his or her membership in a protected class would pass muster under Title VII.  To avoid an unnecessary trial in the face of general workplace enmity unrelated to Title VII, <u>McDonnell Douglas</u> requires a showing of evidence which would, taken as a whole, support a fact-finder's conclusion that the employer took action against the employee because the employee engaged in a protected activity.  The record must be construed in the light most favorable to Plaintiffs and the standard is *de minimus*.  <u>See</u> <u>Sass v. MTA Bus Co.</u>, 2012 WL 4511394, at *7 (E.D.N.Y. Oct. 2, 2012).

The Court finds that the record presented could provide the basis of a verdict in Plaintiffs' favor.  First, the strong temporal proximity between the protected activities and the adverse actions is significant.  The Court acknowledges that temporal proximity is not enough on its own, but it remains a factor to be considered at this stage.  Second, the similarity between the actions allegedly

suffered by Plaintiffs could support a finding that Defendants do not look kindly upon complaints of discrimination. Specifically, both Plaintiffs allege increased scrutiny (Plaintiff Pack in particular claims to have been warned that she was being scrutinized in the wake of her complaint of sexual harassment).[7] Additionally, both Plaintiffs were treated as psychologically unfit and stripped of their firearms shortly following their complaints. Third, as to Nicholas, Defendants have been silent on the issue of her unjustified placement on the Chronic Sick list, which is supported by documentary evidence.[8] Fourth, and particularly troubling, in the case of Plaintiff Pack, the results of the subsequent internal investigation permit the inference not only that her version of the Roll Call Incident had merit, but that ADW McCovey submitted false statements in connection therewith and enlisted subordinates to support his version of events. If the jury, like the ALJ, credits Pack's testimony about the event, it would be evident that McCovey engaged in an abuse of power of the magnitude that could stifle any complaint of discrimination

---

[7] Increased scrutiny alone is insufficient to meet Plaintiffs' burden. However, there are situations where inactionable events can be considered at this stage in the McDonnell Douglas analysis. For example, in Jute v. Hamilton Sunstrand Corp., 420 F.3d 166, 166-7 (2d Cir. 2005), the Court took into account actions outside of the limitations period along with those events still ripe. See id. ("[F]acts, although not actionable because they pre-date [the limitations period], might nonetheless remain admissible at trial and could lead a rational jury to find a causal link between the protected activity and the actionable adverse action.") In the same vein, this Court finds that increased scrutiny can be considered as part of the totality of evidence pointing to retaliation even though it is not actionable in and of itself.

[8] As stated, supra, at fn.6, it is not apparent from the record exactly when Nicholas was placed on the Chronic Sick list. Therefore, this adverse action could not be temporally connected to her participation in a protected activity, and it carried no weight in the Court's determination at step one of the McDonnell Douglas analysis. However, it is another example of a potentially inactionable event that assists in this, the last step of the analysis, per supra, fn7.

within the Department.  For these reasons, the Court finds that questions of fact preclude the grant of summary judgment on Plaintiffs' retaliation claims.

<u>CONCLUSION</u>

For the foregoing reasons, the City's motion is denied.  The matter is hereby set for a pre-trial conference on March 29, 2013 at 9:30am, and for jury selection and trial on April 8, 2013, at 9:30am.  The parties shall confer, and, no later than March 22, 2013, shall file:

1. A joint pre-trial order, pursuant to the undersigned's individual rules;

2. Their respective proposed jury charges and proposed voir dire questions; and

3. Any <u>in</u> <u>limine</u> motions.

**SO ORDERED.**

Dated: February 19, 2013                    _____/s_____
          Brooklyn, NY                                    Sterling Johnson, Jr.
                                               Senior United States District Judge